## LEONARD *v.* RODDA.

APPEALS IN HABEAS CORPUS PROCEEDINGS; APPELLATE PRACTICE; CITATION ON APPEAL; APPEAL, DISMISSAL OF; CRIMINAL LAW; REARREST; TERM OF IMPRISONMENT.

1. An appeal from an order made upon the return to a writ of *habeas corpus* directed to the warden of the District jail, discharging a prisoner from custody, should be by the warden and not by the United States, as the United States cannot be made respondents in such a proceeding.

2. But when the clerk of the lower court, in such a case, in the citation on the appeal, through error, recites that the appeal is by the United States, and upon the filing of the transcript of the record in this court, the clerk titles the cause and enters it upon the docket as the appeal of the United States, such error is not ground for the dismissal of the appeal.

3. Where in such a case an appeal is taken in open court at the time the order is made, and the prisoner is rearrested and required to enter into a recognizance to answer to the appeal, and appears in this court by counsel at the beginning of the term, *it would seem* that a citation is unnecessary.

4. While in such a case the appeal may be in the name of the warden, the United States are the real parties appellant, and under Sec. 1001, R. S. U. S., no appeal bond by him is necessary.

5. When the transcript of a record on appeal has been filed in this court, an order of the lower court dismissing the appeal is a nullity.

6. It is not necessary that the warden of the District jail should file with his return to a petition for a writ of *habeas corpus*, to compel him to discharge a prisoner from custody, the copy of the warrant under which the prisoner is held by him ; *construing* Sec. 1029, R. S. U. S.

7. If the warden of the jail, upon an order of the Supreme Court of the District, in a criminal case, releases a prisoner from custody, although he has at the time a warrant from the Police Court for the detention of the prisoner under a sentence in that court, his inadvertence in so releasing the prisoner will not prevent him from legally retaking him into custody.

8. In such a case it is not necessary that the original warrant from the Police Court should be reissued before the warden can retake the prisoner.

9. And in such a case, where the sentence of the Police Court is that the prisoner shall be imprisoned for sixty days, but does not specify when the term should begin or end, and the sixty days have expired during the appeal from the order in the *habeas corpus* proceedings, the term of the imprisonment will not expire until after sixty days of actual detention, and the term will begin after he is recommitted to the custody of the warden.

No. 407. Submitted January 8, 1895. Decided February 4, 1895.

HEARING on an appeal by the warden of the District jail from an order discharging a prisoner from custody upon his return to a petition for a writ of *mandamus*. *Reversed, and petitioner recommitted into custody.*

The COURT in its opinion stated the facts as follows :

This is an appeal from the decision of one of the justices of the Supreme Court of the District of Columbia, discharging one Walter A. Rodda, under a writ of *habeas corpus*, from the custody of the warden of the District jail.

On October 11, 1894, Rodda was committed by the Police Court of the District to the custody of the warden of the jail to await the action of the grand jury on a charge against him of grand larceny. On October 25, 1894, the attorney of the United States for the District of Columbia entered a *nolle prosequi* upon this charge ; and the Supreme Court of the District, sitting as a criminal court, thereupon ordered the discharge of the prisoner from further custody in that

case. On the same day, however, that is, on October 25, 1894, Rodda was tried and convicted in the Police Court for the crime of petty larceny, and was sentenced to an imprisonment therefor of sixty days in the jail. It would seem that the warden had in his hands the warrant of the Police Court for his custody under this sentence when he received the order for the release of the prisoner under the charge of grand larceny. Thereupon, in inadvertence, as it appears, of the second commitment, the warden discharged Rodda from custody on October 26, 1894; and the latter was permitted to go free and to remain at large until November 9, 1894, on which day he was retaken by the warden, who had in the meantime discovered his error, and was again committed to the jail to serve out the sentence imposed upon him by the Police Court.

Application was then made on behalf of Rodda by a next friend for the writ of *habeas corpus*; and the writ was, on November 16, 1894, ordered by a justice of the Supreme Court of the District of Columbia to be issued, addressed to the warden of the jail to show cause why he held the prisoner; and it was made returnable on the next day. The return was made by the deputy warden on whom the writ seems to have been served and not by the warden; but no point is made of this on either side. In the return it was averred that Rodda was held in custody under a commitment from the Police Court of the date of October 25, 1894; and a paper was annexed to the return purporting to be a copy of the commitment or warrant from the Police Court, certified by the deputy warden to be a true copy, wherein the conviction of Rodda for petty larceny was shown and his sentence therefor to imprisonment for sixty days in the jail. By way of a further return, the deputy warden stated that he had held the prisoner from October 11 to October 26 under the original commitment for the action of the grand jury; and that, upon the receipt of the order for the release of the prisoner from the charge of

grand larceny, he had, through inadvertence of the second commitment, wholly released and discharged him from custody ; and that then he had subsequently retaken him and held him under the second commitment.

Upon the petition and the return thereto, it was ordered by the justice who heard the case that Rodda should be discharged from custody. There is nothing in the record to show specifically upon what ground the learned justice based his decision; but it is understood that he held that, after the voluntary discharge by the warden the latter was not justified in retaking the prisoner, and that therefore the further detention of Rodda was without warrant of law.

The district attorney for the United States, who appeared in opposition to the writ, immediately in open court prayed an appeal to this court. Rodda, however, on the announcement of the decision, had left the court room ; and the district attorney asked for a bench warrant to have him rearrested and brought back, and to have him held in custody during the pendency of the appeal. The bench warrant was issued; and in pursuance of it, Rodda was again arrested, brought into court, and required (on November 21, 1894) to enter into recognizance to enter his appearance to the appeal in this court at its present term. The recognizance was given; and upon its being given, the prisoner was again discharged from custody, and permitted to depart.

In the meantime, on November 20, the district attorney had entered in the office of the clerk of the Supreme Court of the District of Columbia a formal notice of appeal to this court, with a direction to the clerk to issue a citation to Rodda. At the same time he filed with the clerk a paper, in the nature of an information, stating the proceedings that had been had, and that an appeal had been taken to this court, and formal notice thereof entered, as aforesaid, in the clerk's office; that pending the appeal Rodda had escaped from the custody of the warden and was then at large; and praying for the issue of a bench warrant for his rearrest and

his detention in custody during the pendency of this appeal. And it was upon this information that the bench warrant was issued, as already stated, and that Rodda was rearrested, and held to his recognizance for his appearance in this court.

In supposed conformity with the order of the district attorney, the clerk issued a citation, which was served on Rodda on the same day (November 20, 1894). The notice of appeal had been in the name of "John R. Leonard, warden of the United States jail for the District of Columbia;" but the citation purported to be in a case in which "The United States of America is appellant" and Walter A. Rodda appellee, and the latter was required by it to show cause, if any he had, why the judgment rendered against the said appellant should not be corrected. The citation contained the caption—" *United States* v. *Walter A. Rodda*: No. 221. Habeas Corpus." The *habeas corpus* proceedings had been entered by the clerk under the title of "No. 221. Habeas Corpus;" but the designation of the case as the " *United States* v. *Walter A. Rodda*" now appeared for the first time. When the transcript of record was filed in this court (on December 7, 1894), the clerk of this court gave it the same caption that had been given to it by the clerk of the court below, and entered it upon his docket as the case of " *United States* v. *Walter A. Rodda*: No. 221. Habeas Corpus."

We are advised that subsequently, on January 5, 1895, the justice of the court below, before whom the proceedings had been had, made an order, on the motion of the appellee, dismissing the appeal of the warden, on the ground that he had given no bond to perfect the appeal, as required by the rules of this court.

In the argument before us, the counsel who argued on behalf of the appellee, appeared merely in the character of *amicus curiæ*; and urged that the only case brought here by the citation was that of the *United States* v. *Rodda*, that there was no such case, that the appeal of the warden had been dismissed, that therefore there was no case here. He argued

also that there were grave irregularities in the proceedings; and that, in any event, the decision of the justice of the court below, in discharging the appellee, was right on its merits. It was further urged that the case was now no more than a moot case, inasmuch as the sixty days for which the appellee had been sentenced had expired on the 24th of December, 1894, and he could not now be compelled to serve out that sentence. These positions were all controverted by the district attorney.

It may be added that the same counsel appeared specially on behalf of Rodda in pursuance of the recognizance that has been mentioned; and that Rodda having so appeared, objected that there was no case here against him, and prayed leave to depart.

*Mr. A. A. Birney,* U. S. Attorney for the District of Columbia, and *Mr. C. H. Armes,* assistant, for the appellant.

*Mr. Calderon Carlisle* as *amicus curiæ.*

Mr. Justice MORRIS delivered the opinion of the Court:

1. It is necessary, of course, before we can pass upon the merits of this case, that we should determine whether there is, in contemplation of law, any case before us upon which we can pass. It is earnestly urged on behalf of the appellee that there is no such case; and the basis for this contention is found in the terms of the citation that was issued by the clerk of the court below.

It may well be conceded that this citation was defective and irregular. In *habeas corpus* cases the formal parties to the proceedings in whose names the proceedings should be entitled, whenever it becomes necessary that they should receive a title, are the petitioner and respondent. The United States, however greatly interested, cannot be made the formal respondents; for they cannot be sued, and they cannot be presumed to do wrong, or to detain any one illegally. The theory on which the writ of *habeas corpus* is issued is, that some one,

either under color of office or otherwise, is subjecting the petitioner to unlawful detention, contrary to the authority of the United States and in violation of their laws. So far, indeed, as the United States may be assumed to be a nominal or formal party at all in such cases, it would be, inasmuch as the writ is in the nature of a prerogative writ, as complainants on behalf of the petitioner and interested with him in the maintainance of individual freedom under the law. The suit, therefore, was not that of *Rodda* v. *United States*; nor is the appeal in form that of the *United States* v. *Rodda*. The suit, so far as it can be regarded as a suit, was that of *Rodda* v. *Leonard*, warden of the jail; and the appeal should be by Leonard, warden of the jail, and not by the United States, against whom there is, at least in form, no judgment.

But, in pursuing the form, we should not forget the substance. Had the conditions been reversed, we would deem it a mockery of justice, if a petitioner should be deprived of the benefit of his appeal and thereby perhaps of his right to liberty, because the clerk made an error in the form of his citation. What we would deem it just to hold on the one side in the cause of individual liberty, we regard as just to be held on the other side in the cause of public justice and the public morality. Neither the liberty of the individual nor the rights of the State should be permitted to be bartered away by a clerical error. The clerical error in this case has injured no one, and no one has been misled by it; and we do not feel that we are required by any provision of law, or even by any technical rule of pleading, to rest upon it the determination of the important questions of substance that are involved in this suit.

It is not quite apparent that citation at all was required in this case. The object of citation is notice; and where sufficient notice has otherwise been given, a citation is unnecessary. *United States* v. *Gomez*, 1 Wall. 690; *Dodge* v. *Knowles*, 114 U. S. 430; *Hewitt* v. *Filbert*, 116 U. S. 142. And it has also been decided that, when an appeal has been

allowed in open court during the term at which a decree has been rendered, and perfected so far as it is required to be perfected, no citation is necessary. *Milner* v. *Meek*, 95 U. S. 252; *Railroad Company* v. *Blair*, 100 U. S. 661; *Dodge* v. *Knowles*, 114 U. S. 430.

The petitioner had ample notice in this case that an appeal had been taken. There was an appeal taken in open court immediately upon the rendition of the decision. The petitioner was rearrested upon a bench warrant to answer to that appeal. He was required to enter into recognizance to answer to the appeal; and he did so enter into recognizance; and in pursuance of that recognizance he appeared in this court at the beginning of this term by his bail, or by counsel specially appearing for the purpose, it is true, but still appearing in pursuance of the recognizance. And the appeal to which all these proceedings were directed, was the appeal taken on behalf of the warden of the jail, and not any appeal taken on behalf of the United States. It is hard to see how any greater or better notice could have been given than was given by these proceedings. We would be justified even in holding that the special appearance here entered on behalf of the appellee was a waiver of any citation in the matter of the appeal of the warden; for the reservation of right in the special appearance is as to the appeal assumed to have been taken on behalf of the United States. But this it is unnecessary to determine.

2. But it is objected in the second place, that the appeal taken on behalf of the warden of the jail has been dismissed by the justice before whom the proceedings had been had in the court below, on the ground that no appeal bond had been filed in the case to perfect the appeal; and that therefore there is no case here before us.

That the order made by the justice of the court below, on January 5, 1895, assuming to dismiss the appeal of the warden, must be regarded as an utter nullity, is perfectly

apparent to us. He had no jurisdiction of the case at the time. The transcript of record had been filed in this court for nearly a month at that time; and the court below was therefore without authority to dismiss the appeal. Our rules give that authority only when the transcript of record has not been filed here. And, of course, we cannot regard as serious the suggestion that no transcript of record has been filed here in the purview of the rule, because an erroneous caption has been given to it in consequence of a clerical error, as already stated.

But this leaves open the question whether the appeal can now be entertained by us in the absence of an appeal bond by the warden.

While we hold, as we have already stated, that this suit is in form a suit between the appellee, on the one side, as petitioner, and John R. Leonard, who occupies the position of warden of the jail, on the other side, as respondent, we cannot and should not, shut our eyes to the fact that the United States are the real parties in interest, and not the warden. It is perfectly plain that the formal respondent, John R. Leonard, has no personal interest whatever in the controversy. It is of no consequence to him, personally, whether Rodda is released or not. Neither in the suit itself nor in the subject matter of the suit has he any greater or other interest than all citizens have. If the claim of the petitioner is unfounded in fact or in law, it is the United States, and not the warden of the jail, that would be aggrieved by the release. The warden of the jail claims to hold the petitioner, as an officer of the United States, under the authority of the United States, for and on behalf of the United States, under a warrant issued to him from a court of the United States; and his only interest in the premises is the maintenance of the rights of the United States. It would be a strange requirement of law, if, in the performance of his duty to the United States and the defense exclusively of the public interests, he should be necessitated to give his

individual bond for costs in the prosecution of an appeal in a case of *habeas corpus*. And it would have exceedingly strange consequences, if the rights of the public in such cases should be made to depend upon the warden's willingness or ability to give his individual bond. By any such construction of the law or of the rules of court, the right of appeal specifically given by law to the United States as well as to a petitioner would be practically nullified. We cannot think that, either by the letter or the spirit of the law, are we required to adopt a doctrine that would lead to any such conclusion.

It would be an absurdity to treat this case as though the warden alone was interested as the respondent or appellant. This would be to ignore the substance while grasping for the shadow. It has been frequently held that in proper cases the Federal courts will look behind the nominal parties to discover the true parties in interest, and will deal with causes with reference to the rights and privileges of the true parties. *Hagood* v. *Southern*, 117 U. S. 52; *Cunningham* v. *Railroad Company*, 109 U. S. 446 ; *Louisiana* v. *Jumel*, 107 U. S. 711; *New Hampshire* v. *Louisiana*, 108 U. S. 76. It may be that, if the true parties are not apparent on the record, the courts will not industriously seek for them outside of the record. But here the record itself plainly discloses the fact that the United States alone are the true parties in interest, and that the warden, in his individual right, has no interest whatever.

The United States, therefore, being the real parties to this cause, no bond can be required, inasmuch as by law they are expressly exempted from all liability to give bond, either by way of supersedeas or for costs.

Section 1001 of the Revised Statutes of the United States, which is applicable to the District of Columbia as well as elsewhere, provides that "whenever a writ of error, appeal, or other process in law, admiralty or equity issues from or is brought up to the Supreme Court or a circuit court, either

by the United States or by direction of any department of the Government, no bond, obligation or security shall be required from the United States, or from any party acting under the direction aforesaid, either to prosecute said suit or to answer in damages or costs." This statute would govern the present case, even if we were to disregard the fact that the United States are the true parties in interest. For we are justified in presuming that the warden of the jail is acting by direction of the departments of the Government to which he is amenable—the Department of the Interior and the Department of Justice. By Section 1091 of the Revised Statutes of the United States for the District of Columbia, the warden of the jail of the District is required to report annually to the Secretary of the Interior; and by Section 5545 of the Revised Statutes of the United States, it is made the duty of the Attorney General, as the head of the Department of Justice, "to prescribe such regulations for the government of the marshals and the warden of the jail in the District of Columbia in relation to their duties" in the management of prisoners, "as will enable him to determine the actual and reasonable expenses incurred" in such management. And other similar provisions could be cited. It is clear to us from these provisions of law that the conduct of the warden of the jail of the District of Columbia, in the management of the institution under his charge, is subordinated to the heads of the Department of the Interior and the Department of Justice; and we must presume that in the present proceedings he is acting by their direction. Indeed, the appearance for him in his official capacity of the attorney of the United States for the District of Columbia, and the information which that officer has filed in the proceedings and caused to be made part of the record, showing the interest of the United States in the premises, are sufficient to show to us that the proceedings of the warden have been taken under the direction of the departments of the Government to which he is amenable. So, even if it were not apparent

that the United States were the real parties in interest, and as such entitled to prosecute the appeal without bond, the warden is authorized by the express terms of the statute to be exempt from the liability to give such security.

3. This brings to us the consideration of the case upon its merits. But even here we are met upon the threshold of our inquiry by a technical suggestion as to the insufficiency of the return made to the writ. It is objected that the exhibits attached to the return, and designated as Appendix A and Appendix I, are only copies of copies, and are not otherwise authenticated than by the certificate of the deputy warden indorsed upon them, to the effect that they are copies of the original commitments on file in his office. It is not apparent that this objection was raised before the justice of the court below; but, whether it was or not, we cannot regard it as well founded.

Section 1028 of the Revised Statutes of the United States provides that "whenever a prisoner is committed to a sheriff or jailer by virtue of a writ, warrant, or *mittimus*, a copy thereof shall be delivered to such sheriff or jailer, as his authority to hold the prisoner, and the original writ, warrant, or *mittimus* shall be returned to the proper court." It is quite evident from this, and it requires no argument to substantiate the position, that, while the document left with the sheriff or jailer is in fact a copy of the original paper, it becomes with him an original document and is the sole authority which he requires to hold the prisoner. The statute would be useless if he is to be required to produce the original document that has been returned to the court, whenever he is called upon to show his authority. That original is not in his possession or within his control; and the law has substituted the copy for it.

But it is objected that this copy itself has not been produced, but only a copy of it, certified to be such by the deputy warden; and that, inasmuch as the statute makes

the copy left with him to be the warden's authority for hold-ing the prisoner, he shows no authority without the produc-tion of the paper actually left with him.    And it is claimed on this ground the petitioner was properly discharged upon the writ.

There seems to be here a mere misapprehension of terms. The paper left with the warden, although only a copy, is made by the statute the equivalent of the original, and con-stitutes the warden's authority for holding the prisoner.   And while the production of this paper before the court, or before the justice hearing the cause, might well have been required, if deemed necessary, it does not follow that it should be filed among the records of the court.    Indeed, it would be mani-festly improper so to file it; for the law plainly contemplates that it should be retained by the warden as his continuous voucher for the custody of his prisoner.    The warden makes return in writing to the effect that he holds the petitioner under a warrant or commitment from the Police Court; and instead of stating the tenor of that warrant or commitment, as in such a return he might have been entitled to do, he sets forth a copy of it for greater certainty.    Whether he made that copy from the original or from the paper in his possession which stands to him as an original, or from another copy, or even from memory, is of no consequence.    As long as the paper purports to be a copy of the legal document which constitutes his warrant of authority for the detention, the purpose of the writ of *habeas corpus* is subserved, which is to require the respondent to set forth the reason why he detains the petitioner, and not necessarily to require him to set forth in detail the proofs of his authority.    Those proofs might be required at the hearing, if there was occasion, in the opinion of the court or of the justice, for their production; or the warden might have been required to make a fuller return and to exhibit his authority to the court with his re-turn.    But nothing of that kind was done or required to be done.    Nor does it appear that there was any question raised

before the justice below as to the sufficiency of the return in that regard. And we are advised that that question did not enter at all into the decision of the justice below. We do not think that it presents any substantial ground to affect our decision in the case.

We come, at last, to the consideration of the main question in the case, upon which the decision of the justice below appears to have been based—the question whether the warden of the jail, after having inadvertently released his prisoner under the circumstances hereinbefore stated, could again retake him of his own motion and hold him under the warrant of the Police Court for his imprisonment for sixty days. We are unable to acquiesce in the solution of this question reached by the learned justice who presided at the hearing below.

Our attention has been directed in the argument to some cases of voluntary escapes from the sheriff, wherein it was held that, after such voluntary escape, he could not be allowed to retake the prisoner. Most, if not all, of these cases were civil suits; and civil suits manifestly must be governed by different rules from those which control in criminal cases. When imprisonment for debt, or arrest upon mesne process, was an integral portion of our common law procedure, as it was down to a comparatively late period, the detention of the defendant by the sheriff was one of the recognized modes by which a plaintiff sought to enforce his private claim. If, when the sheriff was required to hold such defendant in custody, he voluntarily or negligently permitted him to escape, he thereby became himself liable to the plaintiff for the satisfaction of the latter's demand. The responsibility of the sheriff was substituted for the liability of the defendant, or was superadded to it; and the sheriff, having made himself liable to the plaintiff, could not relieve himself from that liability by rearresting the defendant; and as he was responsible upon his official bond, and the plaintiff could enforce satisfaction through

that bond, there was every reason why the defendant should not be subjected to further coercion, and why the sheriff should be estopped from taking advantage of his own wrong in releasing him by any attempt to retake him. The whole affair was substantially a private matter between the sheriff, the plaintiff and the defendant, in which the public had no interest except the general interest for the due administration of justice, and where these three parties were bound only by the ordinary rules of law applicable to individuals in their conduct towards each other.

But no such rule can be permitted to apply in criminal cases. The laws of civilized society permit no vicarious atonement by the sheriff or warden for the prisoner whom he is directed to hold for the purposes of the punishment of the crime of which that prisoner has been convicted. Those laws make it a penal offense for the sheriff or warden to permit his prisoner to escape; but that is a distinct offense from that for which the prisoner is held; and it would be a strange doctrine to hold that the commission of one crime will, in contemplation of law, relieve the criminal from the consequences of another. That a criminal shall be entitled to immunity because the officer, who has been constituted by law his keeper for the purposes of punishment, has voluntarily or negligently permitted him to escape, and has thereby become himself guilty of crime, is a proposition of law to which we cannot accede. We cannot hold that the misconduct of the custodian can relieve the prisoner from further legal liability. Nor can it make any difference in reason that the action of the custodian has been through inadvertence. The public have rights in such matters which it is beyond the power of the public officer to barter away, even by undertaking to assume liability to himself. The public officer cannot validly release a prisoner when he is commanded by the law to retain him in prison. His release of the prisoner in such a case is an utter nullity: or rather it is a crime when done voluntarily or negligently;

and crime, which it is the purpose of all law to punish, cannot become the basis of immunity from punishment.

It seems to us to be useless to multiply words in the defense of a proposition that, to us, appears to be as plain as this appears, or to seek for authorities in support of it. But authorities are not wanting.

In the case of *Schwamble* v. *Sheriff*, 22 Pa. St. 18, the Supreme Court of Pennsylvania said: "In civil cases, if a party escapes who is in custody on mesne process, he may be retaken at any time before return day. If he is held on final process, the sheriff becomes absolutely liable for the debt and costs by suffering the prisoner to go at large, and he cannot imprison him again. But a party who is in custody, accused or convicted of a criminal offense, whether he be in jail awaiting his trial, or in execution of a sentence after trial—if he escapes, he may be recaptured at any time afterwards, and this whether the escape was voluntary or involuntary on the part of the sheriff. It is well settled that one who has been detained for the non-payment of a fine may be retaken by the very officer who consented to his escape. 6 Hill, 349; 1 Neil Gow's N. P. Cases, 99. It is no argument against this rule that an officer who permits the escape of a convicted criminal may be indicted as the criminal himself would be. The officer does not suffer instead of the criminal, but he is punished with him; and though it be according to the same measure, it is for a distinct offense."

In the case of *Butt* v. *Jones*, 1 Gow's Rep. 99, above referred to, it was said:

"The present is not a case of civil execution as between individuals. The public are here interested. The plaintiff, being convicted of a crime by a court of competent jurisdiction, is committed to the custody of the defendant in execution of the judgment which that court passed upon him. Supposing, therefore, that the defendant had personally been at the outer door of the prison, and had voluntarily and knowingly suffered the plaintiff to escape, yet I think in

point of law it would have been his bounden duty to have retaken him whenever afterwards an opportunity offered, and to have detained him until the fine was paid."

Mr. Chitty, in his work on Criminal Law (Vol. 1, page 61), says on this subject:

"It is clearly agreed by all the books that an officer making a fresh pursuit after a prisoner, who has been arrested and has escaped through his negligence, may retake him at any time, whether he find him in the same or in a different county. . . . But where the officer has voluntarily suffered a prisoner to escape, it is said by some that he can no more justify the retaking him than if he had never had him in custody before, because by his own consent he had admitted that he had nothing more to do with him. It should seem, however, that the misconduct of the officer ought not to prevent a second arrest, in order that the offender may be brought to justice; and where the prisoner has been convicted of a crime, and committed in execution until he pay the fine, and is suffered by the officer to escape, the officer is bound to retake him."

To the same effect are *Dickinson* v. *Brown*, 1 Espinasse, 218; *In re Jilz*, 3 Mo. App. 247; *People* v. *Handutt*, 111 Ill.. 90; *Ex parte Clifford*, 29 Ind. 106; *Trevillian* v. *Roberts*, Rolle's Abridgement, 902; 1 Bishop on Criminal Procedure, Sec. 163; 2 Bishop's Criminal Law, Secs. 1095, 1096.

The true principle in this regard was undoubtedly stated by Mr. Justice Cowen in the case of *Clark* v. *Cleveland*, 6 Hill, 344, where he said, that "the people ought not to be deprived of any right by an escape of whatever kind from custody under criminal process. Though the officer consent to the escape, he is bound to retake the prisoner." The doctrine of this case, it is true, was denied and repudiated in the subsequent case of *Doyle* v. *Russell*, 30 Barbour, 300, where Gould, Justice, said: "It seems to me that the doctrine of that case (6 Hill, 344) is eminently dangerous to the citizen as well as eminently calculated to make officers corrupt and

arbitrary." But the authority of *Doyle* v. *Russell* is itself weak in consequence of the manner in which it is reported. The opinion purports to be by Gould, Justice, and to have been concurred in by Harris, Justice; yet, at the same time, it is stated that Gould and Hodgeboom, Justices, dissented, and that there were only three justices on the bench. But whatever may be the explanation of this statement, the case of *Clark* v. *Cleveland* on this very point subsequently received the unanimous approval and indorsement of the Court of Appeals of the State of New York in 1870, in the case of *Gano* v. *Hall*, 42 N. Y. 67, in which that court said: "The public had a right to demand the execution of the law, which the defendant had no authority to compromise;" and it then proceeds to cite with approval the words already quoted from Mr. Justice Cowen's opinion in the case of *Clark* v. *Cleveland*. The case of *Doyle* v. *Russell* is therefore disapproved, and justly so. We might paraphrase its language so far as to say that the doctrine enunciated in it, so far as it was intended to apply to criminal cases, is eminently dangerous to the public welfare and eminently conducive to the subversion of the due administration of justice. We cannot give our assent to any theory of law that would subject the efficacy of our criminal jurisprudence to the risks of the misconduct, caprice, negligence, or inadvertence of the ministerial officers charged with its execution.

5. But it is suggested that, even if it be conceded that the officer from whom a prisoner has been permitted to escape, has the right to retake him, he may not do so without a re-issue of the warrant or commitment under which the prisoner had previously been arrested or held; and that there should be some new action by the court that had issued the original commitment. Apparent support for this contention is found in some of the authorities, as in the *Case of Jilz* (3 Mo. Appeals, 247), before cited. But it will be seen upon examination of the cases that this rather refers to cases of detention upon mesne process, and not where parties are held

under final execution. However it may be in the former class of cases, and we are not required to express any opinion now upon that point, we fail to see any force in the argument that, in order to restore a convicted criminal to the execution of the sentence from which he has escaped, there must be a reissue of the warrant of commitment. That warrant is not a warrant of arrest, which might plausibly be assumed to have spent itself when the arrest was once made; but a warrant of execution, a warrant for the detention of the party until he should atone to society for the wrong which he had done, and fully suffer the punishment which society exacted as the penalty for his offense. No reissue of such a warrant could give the officer any other or better authority for the detention than that which he already had under the original commitment, which was still to all intents and purposes in force. The duty of the officer under that original commitment was "safely to keep the prisoner in his custody" for the prescribed period of time. This duty remained to be performed. No greater duty could be imposed upon him by the reissue, nor is it apparent what good purpose could be subserved by a reissue either in conserving the liberty of the citizen or in furthering the interests of the public.

6. It is also urged upon us that, inasmuch as the period of sixty days, for which the appellee was sentenced, expired on December 24, 1894, he cannot now be held to complete that sentence, and the case before us is no more than a moot case. This argument would be plausible, if the action of the warden could be held to estop the public from the enforcement of their rights. But this is what we have sought to show cannot be done. The warden of the jail must be denied the possession of the pardoning power directly or indirectly. His action cannot be held by us to affect the right of the public in any manner to have the sentence imposed upon the appellee fully and completely executed.

That sentence has not been executed. It therefore yet remains in force to be executed, since it has not been remitted by any competent authority. The sentence provided for an imprisonment of sixty days. It did not specify when the term should begin or end—although the order of nature would have determined that, if the continuity of the sentence had not been unduly and improperly interfered with in contravention of the mandate of the law. But until an imprisonment of sixty days, in accordance with the sentence, shall have been accomplished, the term of imprisonment will not expire.

We do not ignore the fact that apparent hardship may often result from the rearrest and renewed detention of a prisoner who has been discharged under circumstances such as occurred in this case. But many inconvenient consequences result from crime and from conviction for crime. The argument is one that might properly be used for the interposition of executive clemency. It should not avail to subvert the stability of our criminal jurisprudence.

Upon the whole case we are of opinion that the appellee should not have been discharged upon the writ of *habeas corpus* that was sued out on his behalf, and that it was error to discharge him. The order of the justice of the court below, whereby he was discharged, must therefore *be reversed; and the cause will be remanded to the court below, with directions to issue a warrant for the rearrest of the appellee, and that he be recommitted to the custody of the warden of the jail to serve out the sentence of the Police Court imposed upon him. And it is so ordered.*